UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

14 CV 5848

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

BRIAN LOTT,

                  Plaintiff,

       - against -

COREONE TECHNOLOGIES, LLC,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPLAINT**

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Plaintiff Brian Lott ("plaintiff" or "Lott") through his attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendant CoreOne Technologies, LLC ("defendant" or "CoreOne") as follows:

## NATURE OF ACTION

1.     Plaintiff brings this action to remedy discrimination on the basis of age, perceived or actual disability and retaliation for opposition to unlawful employment practices in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"); the New York State Human Rights Law, Executive Law § 296 et seq. (the "Human Rights Law"); and the Administrative Code of the City of New York § 8-101 et seq. (the "City Law").

2.     Plaintiff additionally brings this action to remedy defendant's breach of contract.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over plaintiff's ADEA and ADA claims under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). This Court has diversity jurisdiction over plaintiff's Human Rights Law, City Law and breach of contract claims pursuant to 28 U.S.C. § 1332, because

1

the parties are citizens of different states and the amount in controversy exceeds $75,000. The Court also has supplemental jurisdiction over those claims under 28 U.S.C. § 1367 because these claims closely relate to the ADEA and ADA claims, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

4.  Venue is proper within this district pursuant to 28 U.S.C. § 1391, because defendant CoreOne regularly does business within this district, and because a substantial part of the events or omissions giving rise to plaintiff's claims occurred within the Southern District of New York.

5.  Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against defendant on November 1, 2013 complaining of the acts of discrimination and retaliation alleged herein. On May 9, 2014, without making a determination, the EEOC issued plaintiff a notice of right to sue. Plaintiff has complied fully with the administrative prerequisites of the ADEA and ADA.

6.  Pursuant to § 8-502(c) of the City Law, plaintiff served a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## PARTIES

7.  Plaintiff is a 56 year-old man who has undergone repeated cancer treatment. Plaintiff is a citizen of California.

8.  Defendant CoreOne is a company incorporated in Delaware and based in New York that provides financial data management software and professional services to clients. CoreOne has offices internationally, and has a staff of over 100 employees. It is an employer

2

within the meaning of the ADA, the ADEA, the Executive Law and the City Law. Before July 2012, CoreOne did business under the name of Netik, LLC ("Netik").

## FACTUAL ALLEGATIONS

### Background

9.      Lott was born in 1958 and is 56 years old.

10.     As part of his education, he studied finance at the University of Maryland, Seton Hall and the University of Phoenix.

11.     Lott worked for CoreOne and its predecessors from 2002 until the involuntary termination of his employment on April 30, 2014.

12.     In or around April 2002, Lott joined Capco. In 2004, following a merger between Iverson Financial Systems and Capco, Lott moved to Dublin, California to facilitate the merger. That year, he was promoted to partner and Chief Operating Officer ("COO") of the newly formed Capco Reference Data Services ("CRDS") business.

13.     In September 2006 the Capco and CRDS businesses were acquired by Symphony Technology Group ("STG"), a private equity firm run by Romesh Wadwhani ("Wadwhani"), the founder, Chief Executive Officer ("CEO") and Chairman.

14.     In December 2007, STG acquired Netik, LLC ("Netik") and merged the Netik business with the CRDS business. In January 2008, Lott was named the Executive Vice President of Operations for Netik.

15.     From February 2008 to January 2010, Lott was the interim COO for Netik. In this position, he oversaw the staff that supported Products, Professional Services, Client Delivery, and Technology.

3

16.     From April 2002 to April 2010, Lott earned consistently high marks in performance reviews and was regularly promoted.

17.     From the merger of Netik and CRDS in 2007 until Lott's employment was terminated, Lott was the oldest and most experienced person among the company's executives and business managers.

### Failure to Promote

18.     From 201 until the termination of Lott's employment in April 2014, CoreOne refused to promote Lott into a number of positions that were awarded instead to younger employees who, upon information and belief, had not disabilities or history of disabilities.

19.     In April 2010, Robert Flatley ("Flatley") became the CEO of Netik. That same month, Lott was diagnosed with cancer and underwent treatment and surgery. His cancer recurred in 2011 and he again underwent surgery. Lott told Flatley about his cancer treatment.

20.     In May 2010, Flatley requested that Lott move back to New York to assume the new role of Global Head of Product, responsible for building a group of industry experts that would lead the direction of Netik products. Given the increase in cost of living expenses, however, the transfer to the East Coast reduced the amount of Lott's net income.

21.     In September 2010, as part of Lott's relocation, Netik agreed to contribute $1,000 per month toward his living expenses ("Relocation Agreement"). The agreement provided that Lott would continue to receive these payments even "in the event that [his] employment is terminated."

4

22.     From 2010 until 2012, Lott supervised all of Netik's product and service activities, including operations and business development. Netik (renamed CoreOne in June 2012), owns several service-delivery businesses, including VistaOne, PrimeOne, and DeltaOne.

23.     When a position for the head of business of VistaOne became available in 2012, CoreOne offered it to Ishan Manaktala ("Manaktala"), a 32 year-old colleague with less experience and less seniority at the company than Lott. VistaOne provides information and data management for asset managers and servicers. Manaktala had originally joined Netik to manage its offshore offices in Bangalore, and had no prior background in data warehousing, data management or client reporting.

24.     Over time, each of the business heads, who initially reported to Lott, were promoted and reported directly to Flatley. All decisions about their compensation were made by Flatley. Lott was never offered the opportunity to lead one of CoreOne's subdivisions.

25.     In August 2010, Flatley hired John Mason ("Mason"), then age 44, as the COO and Phil Dodds ("Dodds"), then age 37, as the Chief Technology Officer ("CTO"). Following Dodds's departure in April 2011, Lott assumed his responsibilities.

26.     In May 2011 Netik acquired CorrectNet, and in February 2012 retained Bob Miller as Netik's CTO. After Miller was fired in March 2013, Lott became responsible for overseeing the technology department. Upon Miller's departure, Flatley agreed that the company would hire a new CTO who would report to Lott.

27.     In July 2012, Mason was fired as COO. Flatley requested that Lott assume a significant portion of Mason's duties by asking Lott to supervise the implementation of Professional Services projects for clients in October 2012 and March 2013. These projects were not related to Lott's role as Global Head of Product.

5

28.     Despite being assigned significant duties for operations and technology projects between January 2010 and May 2013, Lott was never offered the positions of COO or CTO.

29.     Between January 2010 and October 2013, Lott did not receive any salary increases.

30.     In August 2013, after Lott told Flatley that the burden of living expenses in New York had effectively lowered his yearly income by $50,000, Flatley agreed to increase Lott's salary from $300,000 to $350,000. When Lott approached Flatley on August 26, 2013 to confirm the increase and timing in writing, Flatley replied, "I'll come back to you."

31.     The next day, after Lott's counsel contacted CoreOne, he received a letter confirming his salary increase effective October 15, 2013.

32.     On or about May 6, 2013, CoreOne hired Paul Mancinelli ("Mancinelli"), age 45, as the new CTO and transferred a significant portion of Lott's responsibilities to him. Mancinelli was given a salary of $450,000 and a guaranteed bonus.   Under the new organizational structure, Lott no longer retained direct responsibility over technology or operations.

33.     In September 2013, Flatley announced that Mancinelli would report to Manaktala for all VistaOne product development initiatives. Mancinelli was fired a month later, and Reinier van Rooyen ("van Rooyen"), who appears to be in his early 40s, began to serve as the Interim CTO for VistaOne's technology strategy. Van Rooyen is employed as a contractor and receives approximately $2,000 per day, or the equivalent of a $480,000 yearly salary.

34.     In mid-February, Lott continued to oversee the VistaOne data product development efforts because van Rooyen was "burdened with [VistaOne technology] issues."

6

Unequal Bonus Compensation

35.    In May 2008, Lott signed an agreement establishing bonus criteria for senior executives (the "May 2008 Agreement").  The agreement stated that he would receive a bonus as long as the Netik and CRDS businesses achieved at least 90% of their adjusted annual performance targets.  The agreement also stated that bonuses would be paid 10 days after the completion of the business performance audit, and distributed "in any event" by March 31st after the end of the prior fiscal year.

36.    In January 2010, Lott signed an agreement with Netik the ("Second Variation of the Agreement"), which outlined a target bonus of $125,000 and a minimum guaranteed bonus of $50,000.  The agreement also confirmed that he was entitled to six-months notice before his employment could be terminated.

37.    On or about April 2011, Lott received a bonus for financial year 2010 of $125,000.

38.    Lott did not receive a bonus for financial years 2011 or 2013.  To date, he has not received any financial statements confirming that Netik, CRDS or CoreOne had not met its adjusted performance targets in those years.

39.    In April 2012, Flatley informed Lott that Lott would be treated as part of CoreOne's "executive club," and thus would not receive a bonus for financial year 2011.  Unlike other executives, however, Lott was not offered the same reward programs.  Furthermore, upon information and belief, every other member of the "executive club," all younger than Lott, received a bonus for financial year 2011.

40.    In April 2013, Flatley said that Lott would receive a bonus in 2013 for financial year 2012 of $100,000. At Lott's insistence, Flatley agreed to provide a letter

7

documenting that discussion. The letter confirming Lott's bonus award, however, stated that the amount would be paid in October 2013 and in January 2014, which is inconsistent with the terms of the May 2008 Agreement. Lott received no information about whether the bonus was in line with the adjusted performance targets as stated in the May 2008 Agreement.

<u>Unequal Equity Distribution</u>

41. Starting in spring 2009, Lott regularly discussed equity distribution with John Wise ("Wise"), the former CEO, and Bill Rockett ("Rockett"), the former Chief Financial Officer ("CFO") of Netik. In April 2009, Lott helped prepare an equity distribution list, which included Lott and other members of Netik's highest-level officers. Netik's Board of Directors (the "Board") approved the list in 2009. On or about April 2009, Lott received an email about his "Incentive Units" showing that he owned 0.625% of the total shares.

42. In January 2010, Lott worked with Rockett on a plan to distribute unallocated Incentive Units to other Netik employees. At that time, a breakdown of Incentive Unit shareholders showed that Lott owned 1%, or 282,914 units. When Lott reminded Flatley of these figures in August 2013, however, Flatley responded that "the Board never approved the award and that subsequent cash contributions by Romesh [Wadwhani] had diluted their value anyway."

43. From spring 2009 to July 2012, Lott received reassurances from Mark Bala, a current Board member; Andy Eckert, a former board member; Evan Lorch ("Lorch"), the current CFO; Wise; Rockett and Flatley that "[Lott] had ownership" in the company. From 2010 through 2012, Flatley asked Lott several times, "Have you seen your paperwork?" When Lott told Flatley he had not, Flatley said several times, "OK, it's coming."

8

44.     On or about July 17, 2012, after Netik changed its name to CoreOne, Flatley emailed Lott proposed compensation agreements (the 2012 "Performance Unit Agreement" and the "Service Unit Agreement"), which allocated a total of 14,550 Incentive Units to Lott. Flatley stated that he was negotiating automatic vesting on a capital change and "[he] w[ould] have a board motion to [vest] [Lott's] service units and performance units in line with [his]."

45.     In or around July 2012, after the departure of then COO Mason, Flatley informed Lott that Mason's Incentive Units would be distributed between Lott and Manaktala. In September 2013 when Lott asked Flatley what happened to Mason's Units, Flatley said, "I bought some and Romesh [Wadwhani] took the rest."

46.     On or about July 18, 2013, Lott received a second set of Performance and Service Unit Agreements, which allocated a total of 14,148 Incentive Units to Lott, or 0.76% of total shares. Flatley said that he was negotiating the "Change in Control" provision, which conditioned Lott's receipt of Incentive Units on the sale of CoreOne for more than $200 million. In September 2013 Flatley told Lott that all executives had the same $200 million "Change of Control" provision, which Lott later discovered to be untrue. To Lott's knowledge, Flatley and Manaktala did not have the provision in their contracts. Lott complained about this provision to Flatley.

47.     The July 2013 agreements also set a vesting schedule that was inconsistent with prior verbal assurances Lott received that any Incentive Unit agreement would acknowledge his seniority and that his shares began vesting in 2009. CoreOne's management had prepared but not distributed the prior vesting schedule as early as July 2011.   The July 2013 agreements

9

provided for a 40% up-front vesting of Incentive Units, or the equivalent of only two years of service.

48.     On or about August 27, 2013, the Board reapproved the revised terms of the July 2013 agreement, extending the offer until September 26, 2013. The revised agreement changed the "Change in Control" provision that would allow full vesting upon a sale of the company if the purchase price were greater than $180 million. Lorch sent Lott the agreements on August 29, 2013.

49.     Lott returned the signed agreement to Lorch on September 27, 2013, upon his return from his business trip to India. Since Lorch sent the document on August 29, 2013, Lott returned the agreement within the required 30-day window.

50.     Every one of Lott's peer managers, all of whom are younger and with less time at the company, received a percentage of Incentive Units greater than Lott's 0.76%.

Retaliation

51.     On or about September 13, 2013 Lott sent, through counsel, a letter to CoreOne, attempting to resolve issues with his Incentive Unit agreements. The letter also raised concerns about his lack of promotion or salary increases since his cancer diagnosis in 2010, and about unpaid bonus awards from prior years.

52.     On or about September 19, 2013, CoreOne sent a letter stating that it refused to acknowledge Lott's 2009 and 2010 verbal agreements with Rockett and Wise about his Incentive Units. The letter also claimed that Lott was being treated "consistently" with other company executives and that "most other members of management" had similar "Change in Control" provisions in their Incentive Unit agreements.

10

53.    On or about September 21, 2013, Lott's counsel informed CoreOne that Lott would sign a fully executed Incentive Unit agreement upon his return from a business trip to India. Lott submitted fully executed letters to Lorch on September 27, 2013.

54.    On September 27, 2013 Flatley informed Lott that CoreOne had agreed to drop the Change of Control provision. Lott rescinded his previously signed agreements, and awaited new copies of the 2013 Performance and Service Unit agreements to sign and submit.

55.    On or about October 3, 2013, Lott received new versions of the agreements. The October 2013 agreement modified the "Change in Control" provision, but also added a "Release of Claims" provision. No other CoreOne executive's contacts contained a "Release of Claims" provision. On October 5, 2013, Lott returned the previously signed copies of the August 2013 Incentive Unit agreements to Lorch.

56.    On or about October 10, 2013, Lott's counsel sent a letter advising CoreOne of his potential age and disability claims.

57.    On or about October 22, 2013, CoreOne's counsel stated that the terms of the August 2013 agreement had lapsed, and that to receive his shares of Incentive Units, Lott would have to sign the October 2013 agreements containing the "Release of Claims" provision.

58.    Between fall 2013 and spring 2014, Lott was repeatedly stripped of authority and denied promotions.

59.    In December 2013, CoreOne changed its management to a partnership structure, which increased compensation for senior managers. In or around late-January 2014, Lott discovered that every other peer manager had begun to receive a higher partner's salary. Lott, however, did not receive a raise, nor any other confirmation that he had been made partner, as every one of his peer managers had. Lott asked Lorch about his status in the partnership, and

11

Lorch claimed that Lott's paperwork was not submitted on time. Believing this to be untrue, Lott sent a follow-up email to Lorch, but did not receive a reply.

60. Flatley allowed Manaktala to assume a number of Lott's responsibilities. For example, in or around January 2014, when Lott, as Global Head of Product, was organizing a strategy meeting to discuss the Product Agenda for the year, Manaktala took over the scheduling process. When Lott reported this to Flatley, Flatley stated that Manaktala "can schedule when he chooses to."

61. In February 2014, CoreOne denied an internship position to Lott's son, Jonathan, who had previously interned at the company and was knowledgeable about the business. Despite Jonathan's positive performance evaluations in 2013, CoreOne rejected his application in 2014, which departed from its usual practice of re-hiring past interns.

62. In or around mid-February 2014, when Lott submitted his vacation day requests to Flatley, Flatley told Lott to clear his vacation schedule with Manaktala. Manaktala is Lott's peer manager, and Lott had never reported to him in the past.

63. From February 2014 through April 2014 Lott made repeated attempts to discuss and resolve operational business issues with Manaktala and van Rooyen. In nearly every case these emails were ignored.

64. On March 12, 2014, Flatley openly humiliated Lott in a series of emails, on which Lott's peers and their subordinates were copied. In response to Lott's email with action items from the weekly VistaOne Operations Committee meeting, Flatley accused Lott of not understanding "basic information" about client product.

65. On March 20, 2014, Lott met with Flatley to discuss Flatley's March 12, 2014 email. Flatley told Lott that "this is not a game" and that Lott was "self-selecting out of

12

projects." Flatley then accused Lott of "refusing to be involved in VistaOne activities, specifically the [VistaOne] Reporter product." Flatley also said that a client complained that Lott was "nowhere to be found" regarding the client's Professional Services implementation.

66.     In response to Lott's email summarizing their meeting, Flatley replied that "internal senior managers and clients have a negative view of [Lott's] engagement or lack thereof" and that "[Lott was] not working at a level of expectations from a management nor a client perspective." Flatley never raised these issues with Lott before March 20, 2014.

67.     On or about March 27, 2014, Manaktala acknowledged on the phone that Flatley was being "nasty" to Lott because of the way that Flatley "feels about lawsuits." Manaktala said that he was "surprised" that "it didn't get this bad even earlier."

68.     On April 30, 2014, Flatley told Lott that due to a company reorganization, Lott's employment was terminated effective immediately.

69.     On or about May 2, 2014, Manaktala notified employees that Kieran Gallagher ("Gallagher") would replace Lott as Global Head of Product for VistaOne. Gallagher is approximately 15 years younger than Lott, and has significantly less management experience.

70.     On or about May 5, 2014, Lott received a termination agreement that did not acknowledge his equity in the company, the terms of his 2010 Relocation Agreement, or the terms of his 2010 employment agreement guaranteeing him six-months notice before his employment was terminated.

71.     CoreOne has promised to compensated Lott for the six-month notice provision and to pay most of Lott's relocation expenses, but ahs not yet done so.

### FIRST CAUSE OF ACTION

#### Age Discrimination Under the ADEA

72. Plaintiff repeats and re-alleges paragraphs 1-71 above.

73. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of his employment on the basis of his age in violation of the ADEA.

74. Defendant knew that its actions constituted unlawful discrimination and/or acted with malice or reckless disregard for plaintiff's statutorily protected rights. These violations were willful within the meaning of the ADEA.

75. Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to his reputation as a result of defendant's discriminatory practices unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

### Disability Discrimination Under the ADA

76. Plaintiff repeats and re-alleges paragraphs 1-75 as if fully set forth herein.

77. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of his employment on the basis of his disability and/or perceived disability in violation of the ADA.

78. Defendant acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

79. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION

### Age Discrimination Under the Human Rights Law

80. Plaintiff repeats and re-alleges paragraphs 1-79 above.

14

81. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of his employment on the basis of his age in violation of the Human Rights Law.

82. Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to his reputation as a result of defendant's discriminatory practices unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION

### Disability Discrimination Under the Human Rights Law

83. Plaintiff repeats and re-alleges paragraphs 1-82 above.

84. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of his employment on the basis of his disability in violation of the Human Rights Law.

85. Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to his reputation as a result of defendant's discriminatory practices unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION

### Age Discrimination Under the City Law

86. Plaintiff repeats and re-alleges paragraphs 1-85 above.

87. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of his employment on the basis of his age in violation of the City Law.

88. Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to his reputation as a result of defendant's discriminatory practices unless and until this Court grants relief.

15

612133 v2

## SIXTH CAUSE OF ACTION

### Disability Discrimination Under the City Law

89.  Plaintiff repeats and re-alleges paragraphs 1-88 above.

90.  By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of his employment on the basis of his disability in violation of the Human Rights Law.

91.  Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to his reputation as a result of defendant's discriminatory practices unless and until this Court grants relief.

## SEVENTH CAUSE OF ACTION

### Retaliation Under the ADEA

92.  Plaintiff repeats and re-alleges paragraphs 1-91 above.

93.  By the acts and practices described above, defendant retaliated against plaintiff for his opposition to unlawful discrimination in violation of the ADEA.

94.  Defendant knew that its actions constituted unlawful retaliation and/or acted with malice or reckless disregard for plaintiff's statutorily protected rights.  These violations were willful within the meaning of the ADEA.

95.  Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to his reputation as a result of defendant's retaliatory practices unless and until this Court grants relief.

## EIGHTH CAUSE OF ACTION

### Retaliation Under the ADA

96.  Plaintiff repeats and re-alleges paragraphs 1-95 above.

16

612133 v2

97. By the acts and practices described above, defendant retaliated against plaintiff for his opposition to unlawful discrimination in violation of the ADA.

98. Defendant knew that its actions constituted unlawful retaliation and/or acted with malice or reckless disregard for plaintiff's statutorily protected rights.  These violations were willful within the meaning of the ADA.

99. Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to his reputation as a result of defendant's retaliatory practices unless and until this Court grants relief.

<div align="center">

NINTH CAUSE OF ACTION

Human Rights Law – Retaliation

</div>

100.     Plaintiff repeats and re-alleges paragraphs 1-99 above.

101.     At all times relevant to the cause of action, defendant employed plaintiff within the meaning of the Human Rights Law.

102.     By the acts and practices described above, defendant retaliated against plaintiff for his opposition to unlawful discrimination, in violation of the Human Rights Law.

103.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's retaliatory acts.

<div align="center">

TENTH CAUSE OF ACTION

City Law – Retaliation

</div>

104.     Plaintiff repeats and re-alleges paragraphs 1-103  above.

105.     At all times relevant to the cause of action, defendant employed plaintiff within the meaning of the City Law.

<div align="center">

17

</div>

106.    By the acts and practices described above, defendant retaliated against plaintiff for his opposition to unlawful discrimination, in violation of the City Law.

107.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's retaliatory acts.

## ELEVENTH CAUSE OF ACTION

### Breach of Contract

108. Plaintiff repeats and re-alleges paragraphs 1-107 of this Complaint as if fully set forth herein.

109. As described in paragraphs 1-107, plaintiff entered into a multiple agreements with defendant between 2008 and 2012, which guaranteed plaintiff a bonus and vesting schedule for his shares in the company, relocation expenses and six-months notice before his employment was terminated.

110. Plaintiff fulfilled all his obligations pursuant to the terms of the agreement between CoreOne and Lott.

111. By the acts and practices described above, defendant breached the agreements between CoreOne and Lott by failing to pay Lott his agreed upon compensation.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a)    Declaring that defendant's conduct complained of herein violates plaintiff's rights under the ADEA, the ADA, the Human Rights Law, the City Law and common law;

(b)    Enjoining and permanently restraining defendant from violating the ADEA, the ADA, the Human Rights Law, the City Law and common law;

18

(c)   Directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)   Directing defendant to place plaintiff in the position he would have occupied but for defendant's discriminatory and retaliatory conduct and making him whole for all earnings and other benefits he would have received but for defendant's discriminatory and retaliatory treatment, including, but not limited to, wages and other lost benefits;

(e)   Directing defendant to pay plaintiff compensatory damages for his mental anguish and humiliation;

(f)   Directing defendant to pay plaintiff punitive damages for its intentional disregard of and/or reckless indifference to plaintiff's statutory rights;

(g)   Directing defendant to pay damages for breaching contractual agreements;

(h)   Directing defendant to pay reasonable attorneys' fees and costs;

(i)   Directing defendant to compensate plaintiff for any adverse tax consequences;

(j)   Directing defendant to pay prejudgment interest; and

(k)   Granting such other and further relief as this Court deems necessary and proper.

19

DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a

trial by jury in this action.

Dated: New York, New York
July 29, 2014

<div style="margin-left: 40%;">

VLADECK, WALDMAN, ELIAS &
ENGELHARD, P.C.

By: _____

Anne L. Clark
Ming-Qi Chu
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300

</div>

20